UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

LADONNA BERTHIAUME,       )
                          )
            Plaintiff,    )
                          )
v.                        )          No. 2:07-CV-46
                          )
CHRISTIAN HOME for the AGED, INC.,  )
d/b/a APPALACHIAN CHRISTIAN  )
VILLAGE and SODEXHO       )
OPERATIONS, LLC,          )
                          )
            Defendants.   )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Christian Home for the

Aged, Inc.'s d/b/a Appalachian Christian Village ("ACV") motion for summary

judgment, [Doc. 50]. The plaintiff has replied and the matter is ripe for review. ACV

moves for summary judgment on the two causes of action asserted by the plaintiff,

sexual harassment and retaliation. Regarding the sexual harassment claim, this Court

must first decide whether the claim is time-barred. If not, this Court must then decide

whether there is a genuine issue of material fact regarding the claim under either the

supervisory hostile environment analysis or the non-employee or co-worker hostile

environment analysis. Regarding the retaliation claim, the Court must determine

whether there is a genuine issue of material fact as to this claim.  For the reasons that follow, the defendant's motion is **GRANTED**.

## I.  FACTS

The facts viewed in the light most favorable to the plaintiff are as follows:

ACV operates a nursing home, independent, and assisted living facility in Johnson City , Tennessee called the Pine Oaks Assisted Living Facility ("Pine Oaks").  On September 28, 2004, ACV and Sodexho, Inc. ("Sodexho"), a food and facilities management company, entered into a Management Agreement (the "Agreement") for the purpose of Sodexho providing dining services at ACV's facilities, including Pine Oaks.  Specifically, the Agreement provides:

> 1.1 <u>Purpose Of Agreement</u>.  This Agreement sets forth the terms and conditions upon which Client provides Sodexho the exclusive right to manage and operate Services for Client's residents, employees, visitors and guests at the Premises.

> 1.2 <u>Independent Contractor</u>.  Sodexho shall be an independent contractor and shall retain control over its employees and agents. Nothing in this Agreement shall be deemed to create a partnership, agency, joint venture or landlord-tenant relationship.

According to the Agreement, the "Premises" included Pine Oaks.  "Services" is defined as "Dining Services.  Such Services are further defined in the exhibits

attached hereto." "Supervised Employees" are defined as "Client's non-management employees assigned to work in the Services." Other important clauses in the Agreement are as follows:

> 4.1 <u>Personnel Obligations</u>. Each party hereto shall indemnify, and hold the other harmless from and against any claims, liabilities and expenses related to or arising out of the indemnifying party's (i) responsibilities set forth herein and (ii) personnel actions (including wrongful termination, discrimination, etc. brought by the indemnifying party's employee(s)), all claims arising out of injuries occurring on the job regarding employees on its respective payroll and (iii) in the case of Sodexho, the negligence, misconduct or omissions of its employees. Each party shall withhold all applicable federal, state and local employment taxes and payroll insurance with respect to its employees, insurance premiums, contributions to benefit and deferred compensation plans, licensing fees and worker's compensation premiums and shall file all required documents and forms.

> With respect to the supervision of Client's employees by Sodexho management, regarding personnel actions recommended by Sodexho, Sodexho shall at all times comply with Client's written policies, practices and procedures.

Finally, Exhibit A to the Agreement provides:

> 2.1 <u>Sodexho Management/Professional Dining Services Employees</u>. Sodexho shall provide employees to fill the following management positions in the Dining Services:
>
> A. General Manager
> B. Executive Chef
> C. Dining Room Manager

Sodexho's General Manager shall function and be recognized as a department head in Client's facility and shall perform in accordance with Client's department head practices and written policies and procedures.

2.2 <u>Client Management/Professional Dining Services Employee</u>. Client shall provide the following professional employee(s):

A. Dining Manager at Pine Oaks Assisted Living
B. Director of Dining and Wellness Education

2.3 <u>Client Non-Management Dining Services Employees</u>. All Dining Services employees, except those described in Section 2.1, shall be employees of Client.

ACV hired the plaintiff on January 18, 2005, as a full-time kitchen tray aide in ACV's Dining Services Department. At that time, John Barker was her direct supervisor. Scott Meece ("Meece"), as far as the plaintiff was concerned, became her supervisor once Mr. Barker left his employment, regardless of whether his official employer was ACV or Sodexho.[1] Glen Berkel ("Berkel"), apparently a Sodexho employee, was Meece's supervisor.

Upon being hired, the plaintiff received an employee handbook, which contained ACV's sexual harassment policy, and she participated in orientation. The

_____

[1]Plaintiff stated in her deposition that she was not sure who she worked for because when Sodexho "came in" the Dining Services employees wore Sodexho uniforms and got a raise. However, her paycheck was issued by ACV. Moreover, this Court notes that the effective date of the Agreement was 2004, and the plaintiff was not hired until 2005.

plaintiff also was aware of several sexual harassment posters placed around the facility. The posters contained a telephone number to call for reporting incidents of sexual harassment. In addition, the sexual harassment policy informed employees that if the employee believed his or her supervisor was the source of the sexual harassment that person was experiencing, then the employee should immediately contact the next level of management. It also stated that ACV would not "in any way retaliate against any employee who makes a complaint of sexual harassment."

Approximately two to three weeks after Meece became the plaintiff's supervisor, he told the plaintiff, "Let's have cheap, meaningless sex," while the two were in his office. The plaintiff responded, "No thanks, I'm married." Close to this same time, Meece tried to give the plaintiff a shoulder rub while they were in the kitchen, and other workers were present. The plaintiff responded, "I don't do shoulder rubs." Again, around the same time, Meece imitated poking the plaintiff in the buttocks with a barbeque fork as she was walking. Meece also commented that the plaintiff "had a nice ass."

A few weeks after these incidents, while the plaintiff was outside taking a smoke break, Meece made the same "cheap, meaningless sex" comment. Plaintiff responded as she had previously and asked Meece not to say it again. Then, approximately two weeks later, he made the same comment to the plaintiff as she was

standing in the doorway to his office. She again responded in the same manner and stated that it made her uncomfortable. No one else witnessed these three "cheap, meaningless sex" comments.

In April or May, the plaintiff and her co-workers were in Meece's office, and he was preparing a work schedule. A pencil plaintiff was using rolled off the table and onto the floor. The plaintiff pushed her chair back and bent over to get it. Meece said, "Oh, yeah. Stick your ass in the air so I can look at it." The plaintiff responded, "It ain't gonna happen." Meece then asked her about her sex life with her husband. The plaintiff told him that it was none of his business. A couple of days to two weeks later, Meece again asked the plaintiff about her sex life with her husband while plaintiff was on a smoke break.

In June 2005, Meece told the plaintiff while they were in the dining room that she was walking around like she had "something up her ass." In July, the Dining Services employees were getting ready for the July 4 picnic. Plaintiff was alone in the kitchen, and Meece came up behind her, gripped her wrist, pressed his "privates . . . into [her] back side," and tried to reach for her breast with his other arm. However, his finger got caught in her apron, and she pushed away. She said, "This is not happening." Two of her co-workers walked into the kitchen as she pushed away. The plaintiff stated that this incident was the last time that Meece made "requests for sex

or anything like that." However, Meece continued to harass her.

The plaintiff never reported any of the incidents to ACV or Sodexho management. She only told a couple of her co-workers about the first "cheap and meaningless sex" comment and about the pencil incident. She told one co-worker about one of Meece's questions regarding her sex life with her husband and about the barbeque fork incident. She did not tell any of her co-workers about the other incidents, including the July 4 incident.

Plaintiff asserts that she did not report the incidents because she thought Meece was transferring to a job in a different state. She also claims that she was afraid to report the incidents because of information told to her by co-worker, Misty Austin ("Austin"), and because of the termination of another co-worker, Margaret Miller ("Miller").

First, plaintiff claims that Meece told her he had a job opportunity in Virgina. The record is unclear as to when he told her about the possible transfer. Sometime after the July 4 incident, plaintiff was in the kitchen with Meece and his fiancé, and they were talking about still being there for the Halloween party or another event "that was coming up." Plaintiff stated that she thought he was moving. He told her, "I'm not going anywhere, bitch." Plaintiff stated that she was going to report the past incidents, but thought if he were leaving that she "didn't have to worry about it

anymore." However, after she learned Meece was staying, she had a "nervous breakdown" before she "could figure out who it was" she should report the incidents to.[2]

Second, Austin told the plaintiff that any complaints, including to the sexual harassment poster's telephone number, would be investigated by Berkel. Third, plaintiff believed prior to her resignation[3] that Miller had been recently terminated because Miller complained to management, including Berkel, and to Meece about Meece's behavior, namely his cussing and screaming at the employees in front of the residents.[4]

Miller told plaintiff, that on approximately June 2 or 4, 2005, Meece screamed and cussed at her. Miller first complained to ACV management employee Troy Gatti ("Gatti"). Gatti instructed Miller to speak with Berkel, Meece's immediate

_____

[2]This Court gleans from the record that this was a reference to the September 6, 2005 panic attack.

[3]In using the term resignation, the Court is not making a determination that plaintiff was not constructively discharged.

[4]This Court notes defendant's many objections to hearsay contained in plaintiff's additional statement of undisputed facts and Miller's affidavit. Thus, this Court will summarize the facts mainly contained in defendant's statement of undisputed facts, to which the defendant does not object. Albeit, the facts are still considered in the light most favorable to the plaintiff. The Court's summary of facts also uses the facts that were apparently known to the plaintiff prior to her resignation. In addition, these summarized facts are not offered to prove the truth of the matter asserted, but to show what plaintiff believed occurred, which played into her decision not to report. *See* Fed. R. Evid. 801.

supervisor.  Shortly thereafter, Miller was disciplined for an unauthorized break.  The plaintiff asserts that Miller was also disciplined for leaving food in the fry baskets on the evening of the CEO dinner which occurred on approximately June 14 or 15. Plaintiff had checked these baskets and claims that they were actually empty that evening.  On that same night, plaintiff claims that Meece and Berkel gave Miller permission to leave early.  However, Miller was subsequently disciplined for leaving work without completing her assignments.

The record contains a copy of Miller's Progressive Disciplinary Report. There are only three incidents listed: (1) Unauthorized break on June 2; (2) Willful misconduct/ leaving work without completing assignments on June 14; and (3) "No call no show" on June 16.  The June 2 violation was signed by Berkel as the "Supervisor," and his "Title" was listed as "Director of Dining Services."  The action taken was "Final Warning."  Berkel dated this entry as June 6, 2005.  The next two actions were signed by Meece as "Supervisor."  His "Title" was listed as "Dining Services Manager."  The action taken for these two incidents was "Discharge." Meece filled out the reports on June 22, 2005, after Miller's termination.

Plaintiff learned that Miller was fired after the June 14 incident.  Plaintiff believed that Meece had the authority to fire Miller and that it was his decision, and not Gatti's, to fire Miller.

After the July 4 "touching incident," plaintiff claims that Meece continued to harass her by screaming, yelling, and cursing at her. When he would do so, he would unintentionally spit on her. In late July, he started screaming at her when she told him that a resident wanted to speak with him. He followed after her, yelling, stepping on her heels, and poking her in the head with his finger. She asserts in her affidavit that he never yelled at the other three male employees. In her deposition, which was taken prior to her submitting the affidavit, she also stated that he would stand in the kitchen and yell at everyone. There was no mention in her deposition that Meece did not yell at the male employees. In addition, she learned from co-workers that Meece stated out of her presence that he was going to "fire [her] ass." However, when she confronted him, he denied having any intentions to fire her.

Plaintiff asserts that the treatment by Meece made her nervous and that she had to miss work because of stress. Meece also began scheduling her for longer work weeks. She went to a doctor with complaints of stomach pain, stress and diarrhea. The doctor gave the plaintiff a note stating that she should not work more than 40 hours per week. The plaintiff gave the note to Meece. She also told him that she did not want to work fewer than 38 to 40 hours per week.

In August, Meece posted a two-week September work schedule, which was the typical way of conveying to the employees the hours they were to work. It

scheduled the plaintiff to work "a lot of hours." The next day, the plaintiff's doctor's note was taped beside the schedule. Plaintiff denies doing this. The final September 2005 work schedule reduced the plaintiff's typical hours. The third week of the month the plaintiff was scheduled to work 19 hours, and the fourth week she was scheduled to work 22 hours. The plaintiff claims that although her work-week hours varied from week to week since the beginning of her employment, this was a significant decrease, which affected her income.

Saturday, September 3, 2005, was the last day plaintiff worked. She was not scheduled for that Sunday or Monday. However, she was to return to work on Tuesday. Tuesday morning, before leaving her house for work, she began to experience what she later learned was a panic attack. She did not go to work, and she did not call in sick because she feared Meece would answer the telephone. The next day, Austin called her and asked her if she was coming in to work. The plaintiff said she was not because she could not "put up with it any more." On September 8, 2005, an Employee Corrective Action Notice was filled out. It appears to be signed by Meece. The notice states that the plaintiff called and said she would be late on September 7, 2005, but she never came in to work. It further stated that she failed to come to work on September 8, 2005. Under "Corrective Action Plan," it states, "Dismissed."

On September 9, 2005, the Plaintiff went to the facility and did an exit interview with ACV Human Resources Employee Vilma Fair ("Fair"). During the interview, the plaintiff told Fair about the sexual harassment by Meece. She also informed Fair about Meece cutting her work hours. Fair apologized. Plaintiff does not recall whether she asked for her job back or whether she asked for any action to be taken against Meece. Fair called the plaintiff on September 13, 2005, to try to gather more information regarding the allegations. The record is unclear if any action was taken against Meece. Plaintiff never returned to work for ACV.

## II. ANALYSIS

The defendant moves for summary judgment on both claims, sexual harassment and retaliation. Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in

dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient

to establish a genuine issue of material fact necessitating the trial of that issue.  *Id.*

Merely alleging that a factual dispute exists cannot defeat a properly supported motion

for summary judgment.  *Id.*  A genuine issue for trial is not established by evidence

that is "merely colorable," or by factual disputes that are irrelevant or unnecessary.

*Id.* at 248-52.

In Title VII cases, an employee may prove claims of discrimination and

retaliation by either direct evidence or circumstantial evidence.  *Abbott v. Crown

Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). If a plaintiff presents direct evidence

of discrimination or retaliation, then "the burden of both production and persuasion

shifts to the employer to prove that it would have terminated the employee even if it

had not been motivated by impermissible discrimination."  *Nguyen v. City of

Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  If, however, the plaintiff bases claims

of discrimination on circumstantial evidence, then the Court applies the *McDonnell

Douglas* burden-shifting analysis.  *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973); *see also McClain v. NorthWest Community Corr. Ctr. Judicial Corr. Bd.*,

440 F.3d 320, 332 (6th Cir. 2006).  This analysis is summarized as follows:

> First, the plaintiff has the burden of proving by the
> preponderance of the evidence a prima facie case of
> discrimination. Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant "to
> articulate some legitimate, nondiscriminatory reason for the
> employee's rejection." Third, should the defendant carry

> this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253). This Court will apply the above analysis to this case after addressing the sexual harassment statute of limitations issue.

## A. WHETHER THE SEXUAL HARASSMENT CLAIMS ARE TIME-BARRED?

Plaintiffs must typically file a timely discrimination charge with the EEOC in order to bring a Title VII lawsuit. *Alexander v. Local 496, Laborers' Int'l Union of N. Amer.*, 177 F.3d 394, 407 (6th Cir. 1999), *cert. denied*, 528 U.S. 1154 (2000). Pursuant to the statutory language of Title VII, the applicable statute of limitations begins to run from the date of "the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). Title VII has a dual statute of limitations. If the alleged discrimination occurred more than 180 days prior to the plaintiff's filing of an EEOC charge, claims implicating these actions are barred. However, if the alleged unlawful practice occurs in a "deferral state," like Tennessee, which has enacted its own laws

prohibiting discrimination in employment, *see* Tenn. Code Ann. § 4-21-101, the plaintiff must file within 300 days of the alleged discriminatory act. *Alexander*, 177 F.3d at 407. The alleged unlawful employment practice in this case, which the defendant claims is time-barred, did occur in Tennessee, a deferral state, and thus the 300-day period in which to file an EEOC charge under Title VII applies.

The defendant claims that the plaintiff filed her EEOC charge on May 18, 2006. Although there is no documentation in the record to verify the defendant's assertion, the plaintiff does not dispute this. The plaintiff even agrees that any claims prior to July 22, 2005, would be outside the limitations period. However, one exception to the limitations period is the "continuing violation" doctrine. The plaintiff relies upon this doctrine in arguing that her claims are not time-barred. This doctrine provides that when "there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000) (quoting *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992)). In a sexual harassment hostile environment case, retaliatory conduct which is not based on sex cannot be used to bring allegations which are based on sex and which fall outside the limitations period into the continuing violation exception. *See Kettering v. Diamond-Triumph Auto Glass, Inc.*, 24 Fed. Appx. 352, 356 (6th Cir. 2001);

*Shoemaker-Stephen v. Montgomery County Board of Commissioners*, 262 F.Supp.2d 866, 882 (S.D. Ohio 2003); *see also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790-91 (6th Cir. 2000); *Kinsey v. W.S. Badcock Corp.*, No. 1:07-CV-111, 2008 WL 2048207, at *6 (E.D. Tenn. May 12, 2008). Thus, in determining whether the continuing violation exception applies to prevent the plaintiff's allegations of sexual harassment, which occurred prior to July 22, 2005, from being time-barred, this Court must determine whether Meece's treatment of the plaintiff after July 22, 2005, was because of her gender. In other words, this Court must decide whether the conduct was directed at plaintiff because of her gender rather than general rude or uncivil treatment.

More specifically, conduct is based on sex "where it evinces an anti-female animus." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999). In addition, "non-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis, where it can be shown that but for the employee's sex, [she] would not have been the object of the harassment." *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Thus, "any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *See id.* (quoting *Williams*, 187 F.3d at 565).

However, because Title VII is not meant to be a "general civility code," it prohibits only discrimination and harassment based on sex. *See Bowman*, 220 F.3d at 463-64. The critical issue in this analysis is whether members of one sex are subjected to disadvantageous terms or conditions of employment to which members of the other sex are not subjected. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81(1998).

Here, admittedly, this case is a close call. Nevertheless, this Court must view the facts in the light most favorable to the plaintiff. Plaintiff alleges that Meece's conduct after July 22, 2005, consisted of him screaming and cursing her. She refers to his comments as obscene. On one occasion, he referred to her as a "bitch." On another occasion, he screamed at her, he unintentionally spit on her, he stepped on her heels, and he intentionally poked her in the back of the head. Most importantly, the plaintiff alleges that he never exhibited this type of conduct toward the male employees. This Court notes, however, that few males worked in the Dining Services Department during plaintiff's employment. One employee was a part-time 15 or 16 year old young man, another began working on weekends in August 2005, and another male was also hired in August 2005. At all other times, only females were employed in the Dining Services Department. Nevertheless, as stated, this Court must view the facts in the light most favorable to the plaintiff, and she asserts that Meece

did not treat these male employees in the same manner that he did her and other female employees. This type of unequal treatment subjected the plaintiff to disadvantageous terms or conditions of employment to which the males were not subjected.

For these reasons, the Court FINDS that there is a genuine issue of material fact as to whether the post-July 22, 2005 conduct was based on plaintiff's sex. Therefore, this Court cannot conclude that the pre-July 22, 2005 sexual harassment allegations are time-barred. The defendant's motion in that regard is **DENIED**.

### C. SEXUAL HARASSMENT

Because this Court could not determine that the sexual harassment, hostile work environment claim is time-barred, it must determine whether there is a genuine issue of material fact as to the merits of this claim. Section 2000e-2(a) prohibits employers from creating a hostile work environment by discrimination based on gender. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986). To establish a *prima facie* case of sexual harassment based on hostile work environment, the plaintiff must show that "(1) she is a member of a protected class (female); (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance and

creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer."  *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008).

The Sixth Circuit, in *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274-75 (6th Cir. 2009), summarized the analysis courts utilize for determining whether an employer is liable.  That court stated:

> The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. *See Faragher v. City of Boca Raton*, 524 U.S. at 789, 118 S.Ct. 2275; *accord Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000).  Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; if it did, "the employer will, *ipso facto*, be vicariously liable," *Mack v. Otis Elevator Co.*, 326 F.3d [116] at 124 [(2d Cir.2003)]. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to

-20-

prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; *accord Faragher v. City of Boca Raton*, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Mack v. Otis Elevator Co.*, 326 F.3d at 125.

*Id.* (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2nd Cir. 2004)).

The defendant argues that the conduct was not severe or pervasive and that there is no employer liability because, under the non-employee hostile environment analysis, the defendant did not know or should not reasonably have known about the alleged conduct. Alternatively, should the supervisory hostile work environment analysis apply, the defendant argues that it is entitled to prove the *Ellerth/Faragher* affirmative defense and that there is no genuine issue of material fact as to this affirmative defense.

## 1. Whether the Conduct was Severe or Pervasive?

First, the plaintiff must demonstrate that the conduct was severe or pervasive. A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). In making the determination, the Court must

engage in both a subjective and objective analysis. *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). "Rather than considering each event complained of in isolation, [this Court] must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Id.* (citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997)). Factors this Court must consider in making this determination include: "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23. However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. (internal quotation marks and citation omitted).

Meece's conduct in this case occurred on several occasions and for several months. Although there is no clear indication in the record that it was daily or even weekly, it is clear that it occurred on several different occasions, sometimes several times within one month. The conduct solicited sexual intercourse and continued after the plaintiff made it known the comments made her uncomfortable. Meece repeatedly asked her about her sex life with her husband, and that type of questioning is inappropriate. In addition, Meece objectified the plaintiff by

commenting on her buttocks and making it known he wanted her to move into a position so he could stare at it. The most egregious incident, the July 4 incident, involved physical contact, which could be viewed as threatening. After this incident, he continued to curse her, he called her a "bitch," and he physically stepped on her heels and poked her in the head. The plaintiff also states that she was physically affected by the conduct. It caused her to cry and to suffer from anxiety, stomach pains and diarrhea. In sum, there is a genuine issue of material fact as to whether this conduct is subjectively and objectively severe or pervasive. The defendant's motion in this regard is **DENIED**.

## 2. Whether the Non-employee Hostile Work Environment Analysis Applies in Determining Employer Liability?

The defendant argues that because Meece is not an ACV employee, then the claim must be analyzed by applying the law of non-employee harassment. The defendant further argues that in the joint employment context, courts have applied a negligence standard to determine employer liability. *See Graves v. County of Dauphin*, 98 F.Supp.2d 613, 619-20 (M.D. Pa. 2000); *see also Grace v. USCAR*, No. 05-72847, 2006 WL 2850357, at *7 (E.D. Mich. Oct. 4, 2006). The standard for non-employees and for joint employers is more or less the same, and it is essentially the same standard used for co-worker harassment. Moreover, it can be argued that the non-employee standard is a lesser burden than the standard for harassment by a

supervisor.  The non-employee standard is "[w]here an employee is the victim of sexual harassment, including harassment in the form of hostile work environment, by [a non-employee], an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action."  *Gallagher*, 567 F.3d at 275.

Regarding employer liability for supervisory harassment, agency principles govern the imposition of vicarious liability where the alleged harasser is an employee or "agent" of the defendant.  *See Ellerth*, 524 U.S. at 763.  An "employer," pursuant to Title VII, is "a person engaged in an industry affecting commerce . . ., and any agent of such person. " 42 U.S.C. § 2000e(b).  "The term 'agent' is not defined by Title VII, but has been interpreted by courts as an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994) (quoting *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993)).  The Supreme Court has never defined "supervisor" under Title VII. Nothing in *Ellerth* or *Faragher* suggests that the definition of "supervisor" as set forth by the Sixth Circuit in *Pierce* is incorrect.  Thus, this Court will apply that definition. If Meece meets this definition, then the Court will apply the supervisory liability hostile environment analysis.

Here, Meece made out the work schedule for the ACV Dining Services' employees. He controlled their work hours. ACV also admits that he had the authority to discipline these employees. The documents in the record seem to indicate that he even had the authority to fire ACV employees. On these forms, he is listed as "supervisor." The Agreement between ACV and Sodexho states, "This Agreement sets forth the terms and conditions upon which Client provides Sodexho the exclusive right to manage and operate Services for Client's residents, employees, visitors and guests at the Premises." It further states, "With respect to the supervision of Client's employees by Sodexho management, regarding personnel actions recommended by Sodexho, Sodexho shall at all times comply with Client's written policies, practices and procedures." [5] Thus, the entire point of the Agreement was for the Sodexho employees to manage the Dining Services department, including the ACV employees. Accordingly, this Court FINDS that Meece was a supervisor under Title VII, and it will analyze the claim under the supervisory hostile environment framework.

### 3. Whether there is Employer Liability Pursuant to the Supervisory Hostile Environment Analysis?

As stated above, "[w]here the harassment is attributed to a supervisor

---

[5]This Court notes that the agreement even states that the "Dining Manager at Pine Oaks Assisted Living" will be an employee of ACV provided by ACV. It is unclear as to Meece's official title. In addition, no Dining manager is ever mentioned other than Berkel. Thus, this fact could lend more support to plaintiff's argument. However, because the plaintiff did not develop such argument, this Court merely notes it for the record.

with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior 'culminate[d] in a tangible employment action' against the employee; if it did, "the employer will, *ipso facto*, be vicariously liable," *Gallagher*, 567 F.3d at 274-75 (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2nd Cir. 2004). The defendant claims that there was no tangible employment action but does not offer any analysis on this issue. The plaintiff also does not specifically address the issue, but she does, however, claim that she was constructively discharged. She seems to be arguing this as a separate claim. Nonetheless, the Court will address the plaintiff's claim in relation to whether she was subjected to a tangible employment action.[6]

Tangible employment actions "are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Ellerth*, 524 U.S. at 762. These actions are significant changes in employment status, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a change in benefits, or other factors unique to [his] particular situation." *Akers v. Alvey*, 338 F.3d 491, 497-98 (6th Cir. 2003). "Loss of pay" can also constitute a tangible employment action. *See Thornton v. Fed. Express Corp.*, 530 F.3d 451,

---

[6]The plaintiff does not contest that the affirmative defense is applicable. However, because the plaintiff argues she was constructively discharged, this Court, out of an abundance of caution, will address whether plaintiff was subjected to a tangible employment action.

454-55 (6th Cir. 2008). The change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). In a sexual harassment hostile environment case, however, constructive discharge, "while a potential liability-incurring employment action for the employee, is not a 'tangible employment action' in sexual harassment cases. Therefore the affirmative defenses available to employers in non-tangible action cases are available in constructive discharge cases." *Plautz v. Potter*, 156 Fed. Appx. 812, 819 (6th Cir. 2005).

In the absence of a tangible employment action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *accord Faragher*, 524 U.S. at 807.

Under the first prong, employers "have an affirmative duty to prevent sexual harassment by supervisors." *See Williams*, 187 F.3d at 561. "The law is clear that an employer may not stand by and allow an employee to be subjected to a course of racial and/or sexual harassment by co-workers or supervisors. Rather, once an

employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." *Torres v. Pisano*, 116 F.3d 625, 636-37 (2nd Cir. 1997) (internal quotation marks and citations omitted). Therefore, regardless of whether the plaintiff complained of the harassment, the first prong ensures that the defendant will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005); *see aslo Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997) (stating case would only go to jury if employer had reason to know of the harassment). This first prong requires the Court to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior. *See Faragher*, 524 U.S. at 806.

> While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment, *see Varner v. Nat'l Super Markets, Inc.*, 94 F.3d 1209, 1214 (8th Cir. 1996); (2) permit both informal and formal complaints of harassment to be made, *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 541 (10th Cir.1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275; and (4) and provide for training regarding the policy, *Wilson*, 164 F.3d at 541.

*Clark*, 400 F.3d at 349-50.

First, a copy of ACV's policy is a part of the record, and it satisfies all

of the factors for an effective policy listed above. In addition, the plaintiff received the policy and stated that she saw the information posted throughout the facility. Second, the plaintiff argues that the policy was not effective because of the Margaret Miller incident. This Court notes, however, that Miller did not report sexual harassment. Her complaints were limited to how Meece spoke to her in front of the residents. Therefore, this Court does not find that the Miller situation is evidence that the policy was ineffective. There is no genuine issue of material fact as to this prong.

The analysis regarding the second prong is more difficult, however. Under that prong, the defendant must show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *accord Faragher*, 524 U.S. at 807. Plaintiff admits that she never told Berkel, Meece's immediate supervisor, or any ACV management employee about the sexual harassment. This typically would end the inquiry. In this instance, however, the plaintiff claims she did not report the harassment for fear of retaliation. Thus, this Court must decide whether her actions were reasonable under those circumstances.

Again, plaintiff claims that she did not report the harassment because she thought Meece was transferring to a job in a different state. She also claims that she was afraid to report the incidents via the posted telephone number because Austin told

her Berkel investigated those reports, and because of Miller's termination. To be sure, some of the information told to the plaintiff was hearsay. Putting the hearsay statements aside and only considering those statements which are not hearsay and are not offered to prove the truth of the matter asserted, this Court concludes that there is no genuine issue of material fact as to whether the plaintiff acted reasonably.

First, the fact that plaintiff thought Meece may be transferring does not justify her not reporting the harassment to Berkel or ACV management. Second, the plaintiff has not adduced evidence that she was under a "credible threat of retaliation." *See Thornton*, 530 F.3d at 457 (quoting *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1290-91 (11th Cir. 2003)). Plaintiff claims that Austin told her that Berkel would investigate any complaints made via telephone. The plaintiff also claims that Miller complained to Berkel about Meece's language and yelling at her in front of residents. Viewing the facts in the light most favorable to the plaintiff and drawing the inferences in her favor, Miller was discharged shortly after she complained to Gatti, Berkel, and Meece about Meece's behavior. However, Miller's complaints about Meece were not for sexual harassment. Third, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Id*. (quoting *Williams v. Missouri Dep't. of Mental Health*, 407 F.3d

972, 977 (8th Cir. 2005)); *see also, Gallagher*, 567 F.3d at 276.  Based on these facts, this Court concludes that the plaintiff acted unreasonably by not reporting the harassment.  As such, the defendant's motion in this regard is **GRANTED**.

### D.  RETALIATION

The defendant argues that there is no genuine issue of material fact of retaliation under Title VII.  The defendant advances several reasons in arguing there is none.  The defendant is also correct in that the plaintiff did not respond to any of the arguments regarding retaliation.  Nonetheless, this Court will determine whether there is a genuine issue of material fact as to this issue based on the record before it.

In order to establish a *prima facie* case of retaliation, the plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or *harassment*."  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  Regarding retaliation by a supervisor, the employer may prove an affirmative defense by demonstrating: "(a) that the employer exercised reasonable care to prevent and correct any . . . harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." *Id*. at 793 (quoting *Ellerth*, 524 U.S. at 765).

This Court notes that, obviously, the prima facie elements for establishing sexual harassment, hostile work environment claims and retaliation claims are different even though the affirmative defense elements are similar for the two. Most importantly, the retaliation elements require that the exercise of a protected right was known to defendant. The Sixth Circuit has not decided whether declining a sexual advance, in the absence of any informal or formal complaint regarding the conduct constitutes a "protected activity" under Title VII. *See Terry v. Memphis Hous. Auth.*, 422 F.Supp.2d 917, 923 n. 3 (W.D. Tenn. 2006). That issue aside, the plaintiff does not dispute that she did not report the retaliation to ACV until after her last day of work. Thus, ACV was not aware that the plaintiff exercised a protected right. Furthermore, this Court concludes that there is no genuine issue of material fact as to this claim. The defendant's motion in this regard is **GRANTED**.

## III. CONCLUSION

For the reasons set forth above, the defendant's motion is **GRANTED**. As such, the case will be **DISMISSED**.

ENTER:

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE